**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

David M. Martinko

      v.                         Civil No. 22-cv-00238-LM-AJ

N.H. Department of Corrections et al.

**REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff David M. Martinko ("Martinko"), who is proceeding <u>pro se</u>, is confined in the New Hampshire State Prison ("NHSP") where he practices Messianic Judaism. He claims that the meals he receives from the prison kitchen fail to comply with the strictures of his religious "no-pork" diet due, among other things, to substandard food preparation and serving practices, as well as the improper training of kitchen staff. Martinko brought this action against the New Hampshire Department of Corrections ("DOC"), the DOC Commissioner, the Warden of the NHSP and various DOC agents and/or contractors responsible for providing meals at the prison. Following a preliminary review of Martinko's initial pleadings, the court authorized service of Martinko's claims that: (1) the Kitchen Defendants[1] violated his rights under the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") by serving him meals that do not comply with his religious diet and causing him to choose between his religious diet and a nutritious diet or a diet that relies on costly food from the prison canteen;

---

[1] The "Kitchen Defendants" include Robert Heath, Heather Cornock, Pete Bossert, Jake LNU, Mattel LNU, Marcus LNU, Beth LNU (subsequently identified as Elizabeth Mosqueda-Smith), C.J. Boulet and ten unnamed kitchen line servers identified as John Does 1-10. Doc. No. 37 at 6.

and (2) the Supervisory Defendants[2] violated his rights under the First Amendment and RLUIPA by failing to respond effectively to Martinko's grievances concerning non-compliance with his religious diet; failing to appropriately train kitchen staff regarding his religious diet; allowing the kitchen staff to engage in practices that increase the risk of pork contaminating his food; failing to ensure that he receives meals that comply with his religious diet; and causing him to choose between a religious diet or a nutritious diet or a diet that relies on costly food from the prison canteen. The defendants deny liability to the plaintiff under any of these theories.

The matter is before the court on the "Defendants' Motion for Summary Judgment" (Doc. No. 55) by which the defendants are seeking judgment as a matter of law on all of Martinko's claims against them under the First Amendment and RLUIPA or, in the alternative, on Martinko's claims for relief in the form of money damages for emotional distress. The principal issue presented by the motion is whether the defendants substantially burdened the plaintiff's ability to adhere to his religious diet by failing to ensure that Martinko received meals that remained free from contamination with pork products. For all the reasons described below, this court finds that the defendants have shown that they are entitled to judgment as a matter of law on this issue. Accordingly, this court recommends that the defendants' motion for summary judgment be GRANTED.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[2] The "Supervisory Defendants" include DOC Commissioner Helen Hanks; the Warden of the NHSP, Michelle Edmark; the Administrator of Logistics for the DOC, Jonathan Hanson; the Assistant Administrator of Logistics for the DOC, Jeffrey Smith; Kitchen Supervisor Heath; former Kitchen Supervisor Sheehan; Administrator Boulet; Chef Supervisor III Cornock; Dietitian T. Popovich; and John Does 1-10. Doc. No. 37 at 7.

Civ. P. 56(a). "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party[.]'" Taite v. Bridgewater State Univ., Bd. of Trustees, 999 F.3d 86, 93 (1st Cir. 2021) (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)). "[A] fact is 'material' if it 'has the potential of affecting the outcome of the case[.]'" Id. (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)). When ruling on a motion for summary judgment, the court must "view[] the entire record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" Winslow v. Aroostook Cty., 736 F.3d 23, 29 (1st Cir. 2013) (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

"The party moving for summary judgment bears the initial burden of showing that no genuine issue of material fact exists." Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020). The burden then "shifts to the nonmovant to establish that a genuine material dispute exists." Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 411 (1st Cir. 2015). To defeat summary judgment, "the nonmoving party must … 'set forth specific facts showing that there is a genuine issue for trial[.]'" Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 56-57 (1st Cir. 2021) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Conclusory allegations, improbable inferences, and unsupported speculation, are insufficient to establish a genuine dispute of fact." Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (quoting Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)). In determining whether a trial-worthy issue exists, the court will consider "all of the record materials on file, including the

pleadings, depositions, and affidavits[,]" but is not permitted to evaluate the credibility of witnesses or weigh the evidence.[3]  Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014).

Applying this standard in the instant case, the facts relevant to the defendants' motion for summary judgment are as follows.[4]

## II.  **BACKGROUND**

Martinko has been incarcerated at the NHSP since 2013.  Martinko Aff. ¶ 1.  In 2016, he converted to Messianic Judaism, which he continues to practice to this day.  See id. ¶ 2; Compl.

---

[3] On March 14, 2024, Martinko filed a "Request for Hearing on Defendants' Motion for Summary Judgment" in which he requested an evidentiary hearing so he could challenge "the truthfulness and content of affidavits provided by the defense" in support of their motion for summary judgment and seek to have them stricken from the record.  Doc. No. 68.  Martinko's request for a hearing is denied.  As an initial matter, the deadline for Martinko to oppose the defendants' motion expired in November 2023, and the plaintiff had ample opportunity to present any evidence demonstrating the existence of genuine issues of material fact.  See Docket No. 59; Endorsed Order dated 10/26/2023.  Additionally, to the extent Martinko is seeking to develop additional facts to support his opposition, he has failed to file a motion seeking supplemental discovery pursuant to Fed. R. Civ. P. 56(d), or to satisfy the requirements for obtaining such relief.  See Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014) (explaining that "Rule 56(d) allows, in certain circumstances, for supplemental discovery after a motion for summary judgment has been filed" and describing the requirements for obtaining relief under that Rule).

[4] The background facts are derived from the following evidence, which the parties submitted prior to and in connection with the motion for summary judgment: (1) the Affidavit of David Martinko (Doc. No. 1-1) ("Martinko Aff."); (2) the Affidavit of Shane Vadney ("Vadney Aff.") (Doc. No. 1-1); (3) the Affidavit of Darrin Partlow ("Partlow Aff.") (Doc. No. 1-1); (4) the Affidavit of Seth Bader dated February 23, 2022 ("Bader Aff.") (Doc. No. 1-1); (5) the Declaration of Daniel Ayer ("Ayer Decl.") (Doc. No. 1-1); (6) the Declaration of Jeffrey Smith ("Smith Decl.") (Doc. No. 12-1); (7) NH Department of Corrections Policy and Procedure Directive ("PPD") 672 (Doc. No. 12-2); (8) PPD 8.10 (Doc. No. 12-4); (9) Director Jonathan K. Hanson's Declaration in Response to ECF 27 ("Hanson Decl. I") (Doc. No. 29) and the exhibits attached thereto ("Hanson Ex."); (10) the Declaration of Seth Bader dated March 5, 2023 ("Bader Decl.") (Doc. No. 32-1); (11) the Declaration of Jonathan Hanson dated June 28, 2023 ("Hanson Decl. II") (Doc. No. 49-1); (12) the Declaration of Edgar Clifford Avery ("Avery Decl.") (Doc. No. 51); and (13) an Inmate Request Slip from Martinko to Chaplain Pelletier dated July 12, 2023 ("7/12/23 IRS") (Doc. No. 53-1).  Additionally, this court has considered the evidence relied upon by the parties in connection with Martinko's (second) motion for a preliminary injunction, which is described in detail in this court's March 1, 2024 Report and Recommendation (Doc. No. 66).

(Doc. No. 1) ¶ 25.  As part of his religious practice, Martinko adheres to a restrictive diet.  See Martinko Aff. ¶¶ 2, 7.  He avoids eating leavened foods during Passover and, at all times, follows a diet that prohibits foods containing shellfish, gelatin or any pork products, including but not limited to, pork, bacon, ham and other foods derived from pork, as well as any foods that have been contaminated by contact with a pork product.  See id. ¶¶ 2-3, 15; 7/12/23 IRS.  At issue is whether the defendants imposed a substantial burden on Martinko's religious exercise by failing to implement and/or enforce procedures that prevented his meals from becoming contaminated with pork and pork products.

### Availability of No-Pork Dietary Options at DOC Facilities

The DOC offers four different special diets for prisoners whose religious faith involves dietary restrictions.  PPD 672(V)(F)(2)(b).  Two of those diets are vegetarian diets and two of those diets – the kosher/halal diet and the "no-pork" diet – include meat but exclude pork products.  See id.; Hanson Decl. I ¶ 7(2).[5]  At the time Martinko filed this action, he was receiving the no-pork diet.  See Martinko Aff. ¶¶ 2, 7, Hanson Decl. I ¶ 7(1)(i).  He subsequently switched to the kosher diet, which he receives currently.  See Hanson Decl. II ¶¶ 6, 8; 7/12/23 IRS.[6]  Both the kosher diet

---

[5] Martinko argues that Hanson Decl. I is inadmissible because it contains hearsay.  Doc. No. 60 at 13-14.  Specifically, Martinko challenges Mr. Hanson's statement that an unnamed rabbi approved the procedures applicable to the preparation of kosher meals at the NHSP.  Id.  "It is black-letter law that hearsay evidence cannot be considered on summary judgment."  Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007).  However, this court has not relied on the challenged statement.  Therefore, even assuming it constitutes hearsay, there is no reason to reject the remaining portions of the Declaration.

[6] Martinko contends that Hanson Decl. II is inadmissible because it describes food handling procedures at the DOC facility in Berlin, New Hampshire rather than food handling procedures at the NHSP in Concord, New Hampshire.  Doc. No. 60 at 14.  According to Martinko, "testimony of Berlin conditions have no bearing on the present case" and are therefore irrelevant to the matters raised on summary judgment.  Id.  However, in his Declaration, Mr. Hanson purports to rely on policies and procedures that are applicable to all New Hampshire DOC facilities.  See Hanson Decl. II ¶¶ 3-4.  To the extent he describes specific food handling practices relating to Martinko's

and the no-pork diet are nutritionally equivalent to the regular, non-religious meals that are served at DOC facilities, and comply with state and federal standards pertaining to the nutritional needs of prisoners.  Hanson Decl. I ¶ 7(3)(i).  The DOC's kosher diet is more restrictive than the diet typically followed by the Messianic Jewish community and fully meets the requirements of a no-pork diet.  Id. ¶ 7(2)(i).

It is undisputed that pork-free meals are also available for purchase from the prison canteen.  See Compl. (Doc. No. 1) ¶ 87; Doc. No. 55-1 at 4.  However, Martinko contends that he earns only fifteen dollars a week and cannot afford to purchase his own meals.  Doc. No. 60 at 2; Martinko Aff. ¶ 25.

<u>The DOC's Religious Meal Service Procedures</u>

The DOC has adopted policies and procedures for its food services operations that provide guidelines for meal service, menu planning, safety and sanitation, and proper security for kitchen and dining facilities at all DOC locations.  Doc. No. 12-4 ¶ I.  It has also adopted policies and procedures relating to special diet meals, including religious meals.  See Smith Decl. ¶¶ 3-4, 7-13; Hanson Decl. I ¶¶ 4-5, 7(4)-(7).[7]  Pursuant to those policies and procedures, prisoners in DOC

---

kosher meals, there is nothing in his Declaration to suggest that he was referring to practices at the Berlin facility rather than the NHSP.  See id. ¶¶ 8-12.  Consequently, this court declines to exclude the Declaration.

[7] Martinko argues that the Smith Decl. is inadmissible because it reflects food handling and service procedures at the DOC facility in Berlin and is not relevant to the procedures used at the NHSP in Concord.  Doc. No. 60 at 13.  Specifically, Martinko argues that "[b]ased on the counter-declaration of Mr. Avery, who actually works on the serving line in Concord, it is clear Mr. Smith's testimony of kitchen practices and the description of the serving line as having concrete blocks are about Berlin – where Mr. Smith is employed."  Id. ¶ 58.  However, Mr. Smith purports to describe policies and procedures that are applicable to all New Hampshire DOC facilities.  See Smith Decl. ¶¶ 3-4.  While Mr. Avery's testimony raises issues of fact regarding Mr. Smith's description of the chow hall and the prisoners' ability to observe activities in the kitchen, it provides no basis for excluding Mr. Smith's Declaration.

custody must request a specific diet using a Religious Diets Request Application form.  PPD 672 ¶ V(F)(2)(a).  The form is submitted to the prison Chaplain who verifies that the request is based on a sincerely held religious belief and helps ensure that the information is entered into the DOC's electronic management system.  Id. ¶ V(F)(2)(e).  Martinko has been receiving a religious diet since 2016.  See Martinko Aff. ¶ 2.  In March 2023, he switched from the NHSP's religious "no-pork" diet to the NHSP's kosher diet.  Doc. No. 48 ¶ 4; see also 7/12/23 IRS.  There is no evidence suggesting that Martinko was prevented from requesting a kosher diet at any time following his conversion to Messianic Judaism.

NHDOC procedures call for special diet meals to be prepared in an area of the kitchen that is separate from the areas used for regular meals.  Smith Decl. ¶ 7.  They also call for those meals to be assembled ahead of time and kept warm in nearby warming cabinets or carts.  Id. ¶ 9.  To receive their special diet meals, prisoners must request the meal at the time it is provided and present their ID to the kitchen staff.  See id. ¶ 5; Hanson Decl. I ¶ 7(7).  Either the chef or one of the prisoners working in the kitchen then retrieves the prepared meal and gives it to the resident.  Smith Decl. ¶ 10.  There is no requirement that the individuals handling the food trays wash their hands or change their gloves before serving the next prisoner in line.  See id. ¶ 11.

The DOC has also adopted specific procedures aimed at preventing cross-contamination of kosher meals with prohibited food items.  See id. ¶ 12.  In particular, the DOC purchases shelf-stable kosher entrée items in sealed packages from a vendor who has been contracted to meet kosher standards.  Hanson Decl. I ¶ 7(4)(i)-7(5)(i).  The entrées are heated in the original packaging and remain sealed until the resident receives it and opens the package.  Id.  ¶ 7(4)(i); Hanson Decl. II ¶ 7.  The DOC's procedures call for other kosher food items, such as fresh vegetables and pre-made bread, to be prepared and stored using kosher-compliant surfaces and utensils, and kept

separate from non-kosher food items, utensils and surfaces.  Hanson Decl. I ¶ 7(4)(i); Hanson Decl. II ¶ 7.  The use of packaged entrées is intended to ensure that no hidden pork-based ingredients or cross-contamination is present in the food, while the use of dedicated surfaces and utensils is intended to ensure that kosher standards are met and there is no cross-contamination from pork products during food preparation and storage.  See Hanson Decl. I ¶ 7(5)(i).

Jonathan Hanson ("Hanson"), the Director of Administration for the NHDOC, provided two Declarations in which he describes the contents of the kosher meals that Martinko currently receives at the NHSP.  According to Hanson, those meals typically consist of a sealed packaged kosher entrée that has been warmed up; a paper bag containing a dessert, snacks or other prepared food items; a Styrofoam cup containing steamed vegetables; and a plastic cup, all of which are served on a basic, cafeteria-style tray.  Hanson Decl. II ¶ 8.  The non-sealed foods, such as fresh vegetables and pre-made bread, are stored and prepared using kosher compliant surfaces and utensils, and are kept separate from non-compliant surfaces, utensils and non-kosher food items. Hanson Decl. I ¶ 7(4).  Hanson further states that while kitchen workers handle trays used for non-kosher meals, there are no concerns about cross-contamination because those workers wear gloves and do not touch the food directly with their gloved hands.  Hanson Decl. II ¶ 11.

Evidence of Pork Contamination

Martinko contends that since about 2017, kitchen workers at the NHSP have "engage[d] in a pattern of violating [his] religious diet."  Martinko Aff. ¶ 4.  Thus, Martinko states that when he first signed up to receive a no-pork diet, he relied on the kitchen to notify him when meals contained pork by posting a sign informing prisoners to ask for the no-pork alternative.  Id. ¶ 5. However, the kitchen often failed to post the sign or otherwise notify prisoners when meals included pork so Martinko was not always aware that his meals contained pork.  See id. ¶¶ 5-7.

8

He further maintains that even after he learned to ask for the no-pork option at every meal, the kitchen continued to serve him food containing pork products.  Id. ¶ 7.  While Martinko was sometimes able to spot the pork prior to consumption, "most times" he only learned of the pork contamination after he ate his meal.  Id.

The plaintiff complained about the kitchen's practices with respect to his no-pork diet.  See id. ¶ 8.  In response, the kitchen staff told Martinko to request no-pork meals, ask the chef on duty to confirm that no pork products were present in his food, and write to the kitchen if he wanted further information about the contents of the food.  Id.  Martinko claims that these proposals were insufficient to address the issue of pork contamination in his no-pork meals because he was already requesting a no-pork alternative at every meal, the chef on duty admitted to not knowing whether pork products were present in the food, and the food could not last long enough for Martinko to wait for the kitchen to reply to his written questions.  Id. ¶ 9.  He further avers that when he did write to the kitchen staff to ask about specific meals, he was told that the kitchen did not track soups to determine whether they contained pork.  Id. ¶ 10.  Additionally, Martinko asserts that the kitchen workers were unable to provide accurate information about the contents of his no-pork meals because the packaging and labels had sometimes been discarded, the food they ordered from the warehouse did not always match the food that was delivered to the NHSP, some of the pork-free food items looked similar to items containing pork, and kitchen staff were not always aware when pork was present in the food.  Id. ¶¶ 10-12, 14.  In short, according to Martinko, the kitchen staff was often confused and could not say with any accuracy whether or not the plaintiff's meals complied with his pork-free diet.  See id. ¶ 14.

Martinko maintains that the food preparation and handling practices at the NHSP also led to cross-contamination of his no-pork diet foods with pork.  Id. ¶ 15.  For instance, Martinko states

that he witnessed "someone handling pork and then touching a food intended for [his] special diet." Id. He also witnessed "pork foods being ladled over [the] top of special diet food where the pork food drips into the dish below."[8] Id. Additionally, Martinko claims that he saw "a special diet food item be placed on a tray with pork and then returned to the pan, [thereby] contaminating all the other food in that pan." Id.

Martinko has presented evidence from other prisoners who also witnessed cross-contamination of no-pork special diet meals with pork at the NHSP. One such individual is Darrin Partlow, ("Partlow"), a prisoner who has worked in the kitchen at the NHSP for approximately eight years. Partlow Aff. ¶ 1. In an Affidavit submitted in this case, Partlow states that he has "witnessed many instances of improper food handling" at the NHSP, including "many instances where cross-contamination between pork and the non-pork alternative occurred at the preparation stage" and instances involving "cross-contamination of the no-pork diet with pork at the point where trays are made." Partlow Aff. ¶¶ 1-3, 9-10. As Partlow explains in further detail:

> [o]ne of the practices that leads to this contamination is in allowing the same person to slice and/or portion-out the meats for the meal. The person goes from handling pork to handling non-pork meat, and often repeats those steps while portioning-out

---

[8] The parties dispute whether Martinko had the ability to observe instances in which kitchen workers engaged in food handling practices that resulted in cross-contamination of his no-pork meals with pork products. According to Jeffrey Smith, an Assistant Administrator of Logistics at the DOC, concrete blocks prevent visibility between the kitchen and the chow hall, leaving only a small window where meal trays can be passed to prisoners and prisoners on special diets can pass their ID to kitchen staff to ensure receipt of the proper meal tray. Smith Decl. ¶ 5. However, Edgar Clifford Avery, a prisoner at the NHSP, has explained that the concrete block construction is a feature of the Berlin, New Hampshire prison, and that the Concord prison where Martinko has been incarcerated has a steel barrier between the chow line and the kitchen "in which a large plexiglass window has been installed, roughly 18 inches by 2 feet." Avery Decl. ¶ 10. For purposes of summary judgment, this court must view the record in the light most hospitable to Martinko and accept Mr. Avery's description of the facility. See Winslow, 736 F.3d at 29 (explaining that court must view the record "in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." (quotations and citation omitted)).

the food.  This crossing between pork and non-pork is exacerbated by a failure to clean the work area, equipment, or the workers' hands.  Gloves, when used, too often do not get changed.

Id. ¶ 9.  Partlow also describes a specific incident in which he discovered ham in a vegetarian soup that was supposed to be used for nearly all of the special diet meals.  Id. ¶ 3.  Although Partlow observed some improvements after he complained about the soup and other food handling practices, he maintains that "the old practices returned" within a few weeks and he continued to witness "many instances" where cross-contamination occurred between pork and non-pork meals.  See id.¶¶ 5-10.

Edgar Clifford Avery ("Avery"), a prisoner who has worked in the NHSP kitchen for nine years, also provided a written Declaration in which he describes improper food handling practices at the NHSP.  According to Avery, special diet trays are not always prepared ahead of time, as called for by the DOC's policies and procedures, and "[i]n many cases," some or all of a special diet meal is placed on the serving line next to the regular meals.  Avery Decl. ¶ 7.  Additionally, Avery states that "[r]esident line workers and kitchen supervisor staff regularly handle unpackaged food items with gloved hands (and without utensils)," including but not limited to, hot dogs, sausage patties and sausage links.  Avery Decl. ¶ 3.  They then "handle other food items, packaged food items, trays, and cups without changing gloves."  Id. ¶ 5.  Moreover, Avery "regularly observe[s] resident workers and supervisor staff handle food items without utensils and then handle special diet trays (including Kosher trays) and cups without changing gloves."  Id. ¶ 9.  Notably, however, Avery provides no evidence indicating whether or to what extent any of the kosher food items have ever been touched or otherwise contaminated with pork.

Finally, Seth Bader ("Bader"), another prisoner who has worked in the NHSP kitchen for many years, recounted an incident in which a member of the kitchen staff caused the cross-contamination of no-pork soup with pork. As Bader describes in a Declaration:

> On 3/4/2023 while waiting in line to get lunch I witnessed a staff member engage in cross-contamination. The server was wearing gloves, ladling the pork and no-pork soups. The manner which she held the bowl caused her thumb . . . to come in contact with the soups as they filled the bowl. The same dirty finger would enter the next bowl, soup after soup. As a result, her glove had been in contact with pork when it then came in contact with the vegetarian – and by extension, – no-pork soups.

Bader Decl. ¶ 8. While Bader does not believe that pork contamination of no-pork meals occurs intentionally, he explained that kitchen staff do not always know what ingredients are included in a particular food product and cannot ensure that food such as meat products and soups contain no pork. See Bader Aff. ¶¶ 5-9.

It is undisputed that Corrections Officers are present in the NHSP chow hall during mealtimes and that prisoners who have concerns about their meal, such as concerns about pork contamination, may ask one of the Corrections Officers to discuss the matter with the chef. Smith Decl. ¶ 13. If the chef is unable to resolve an issue, the prisoner can seek assistance from the housing officer in command. Id. It is also undisputed that Martinko has been complaining about the handling of his special diet meals for more than five years. See Martinko Aff. ¶ 19. He claims that DOC personnel have failed to address his complaints and accused him of making false claims. Id. ¶¶ 20-21. He further claims that the defendants' conduct has caused him significant distress and anxiety, and has interfered with his ability to exercise his religious beliefs. Id. ¶¶ 23-26. By his claims in this action, Martinko is seeking declaratory, injunctive and monetary relief, including but not limited to, "money damages for emotional trauma" he allegedly suffered as a result of the defendants' conduct. Doc. No. 1 ¶¶ 83-90.

Additional factual details relevant to this court's analysis are set forth below where appropriate.

### III. DISCUSSION

#### A. Defendants' Challenge to Martinko's RLUIPA and First Amendment Claims

The defendants have moved for summary judgment on all of Martinko's claims under RLUIPA and the First Amendment's Free Exercise Clause on the grounds that there is insufficient evidence to show that the defendants' handling of Martinko's special diet meals imposes a "substantial burden" on the plaintiff's religious exercise.  Specifically, the defendants argue that Martinko has three options for obtaining meals that exclude pork, including the no-pork religious diet, the kosher religious diet and the ability to purchase meals from the canteen that contain no pork.  Doc. No. 55-1 at 8-9.  They further assert that because each of these alternatives satisfies the restrictions of his religious diet, Martinko cannot establish a substantial burden within the meaning of RLUIPA or the Free Exercise Clause.  See id. at 9, 14-15.

Martinko disputes these assertions and contends that the defendants have substantially burdened his religious exercise by failing to provide him with meals that are free from and not cross-contaminated with pork.  Doc. No. 60 at 8.  Although he does not dispute that meals from the canteen would enable him to avoid pork, Martinko argues that this option is cost prohibitive and would not eliminate the substantial burden on his ability to practice his religion.  Id. at 11-12. For the reasons that follow, this court finds that while Martinko has presented sufficient evidence to create an issue of fact as to whether his no-pork meals were regularly contaminated with pork products, he has failed to present adequate facts to show that the defendants' actions have resulted in pork contamination of his kosher meals such that they impose a substantial burden on his

religious exercise.  Therefore, this court concludes that the defendants are entitled to summary judgment on all of Martinko's claims.

### i.  Elements of Plaintiff's RLUIPA and Free Exercise Claims

RLUIPA prohibits certain prisons, including the NHSP, "from imposing a 'substantial burden' on an inmate's 'religious exercise' unless prison officials can demonstrate that the imposition of such a burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" LeBaron v. Spencer, 527 Fed. Appx. 25, 28 (1st Cir. 2013) (quoting 42 U.S.C. § 2000cc-1(a)).  See also Kuperman v. Wrenn, 645 F.3d 69, 79 (1st Cir. 2011) (explaining that RLUIPA bars prisons receiving federal funds from substantially burdening an inmate's religious exercise unless the regulation under attack is the least restrictive way to advance a compelling state interest.").  To prevail on a claim under RLUIPA, the "plaintiff bears the burden of demonstrating that he or she wishes to engage in '(1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government.'" LeBaron, 527 Fed. Appx. at 28.  If the plaintiff is able to make this showing, "the onus shifts to the government to show . . . that the burden furthers a compelling governmental interest and . . . that the burden is the least restrictive means of achieving that compelling interest." Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 38 (1st Cir. 2007).  In this case, the defendants contend that they are entitled to summary judgment on Martinko's RLUIPA claims because he has not presented sufficient evidence to show that they imposed a substantial burden on his ability to practice his Messianic Jewish faith.

A violation of the First Amendment's Free Exercise Clause also requires a showing that the prison placed a substantial burden on the prisoner's ability to practice his religion.  Thus, "[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation

of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 101 (1st Cir. 2013) (alteration in original) (quotations and citations omitted). "Prison policies that impinge on inmates' First Amendment rights, including their religious freedom rights, are valid if the restraints imposed by such policies are reasonably related to legitimate government objectives and are not excessive in relation to those objectives." Czekalski v. Hanks, No. 18-cv-592-PB, 2020 WL 7231358, at *25, 2020 U.S. Dist. LEXIS 231179, at *72 (D.N.H. Dec. 8, 2020). Here, the defendants argue that Martinko's failure to present evidence of a substantial burden on his religious practice warrants summary judgment in their favor on his First Amendment claims as well.

### ii. Existence of a Substantial Burden

"[A] substantial burden on one's exercise of religion exists '[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Perrier-Bilbo v. United States, 954 F.3d 413, 431 (1st Cir. 2020) (second alteration in original) (quoting Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 717-18 (1981)). Moreover, "it has been held that 'a prisoner's religious dietary practice [is] substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition.'" LeBaron, 527 Fed. Appx. at 30 (alteration in original) (quoting Nelson v. Miller, 570 F.3d 868, 879 (7th Cir. 2009)). See also Brandon v. Kinter, 938 F.3d 21, 32 (2d Cir. 2019) (noting that, "[s]ince at least as early as 1975," the Second Circuit "has generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."

(internal quotations and citations omitted)). Because the record contains inadequate evidence to show that Martinko's kosher meals have been contaminated with pork, this court concludes that the defendants have not imposed a substantial burden on Martinko's ability to practice his religion by preventing him from eating a pork-free diet, and that their motion for summary judgment should be allowed.

Cross-Contamination of No-Pork Meals

In support of their motion for summary judgment, the defendants first argue that there is no substantial burden on Martinko's religious exercise because the plaintiff is able to receive a no-pork religious diet that conforms to the prohibition on his consumption of pork. Doc. No. 55-1 at 9-10. Thus, the defendants maintain that

> [t]he no-pork diet does not contain pork, is nutritionally equivalent to the regular, non-religious diet that DOC provides, and meets state and federal standards regarding the nutritional needs of inmates. DOC food service personnel prepare religious diet meals ahead of time and in a separate area of the kitchen. Food service personnel follow religion-based standards to prevent cross-contamination. Therefore, the no-pork diet complies with the Plaintiff's religious diet, which prohibits him from consuming pork.

Id. at 9 (internal citations omitted). However, Martinko has presented evidence that conflicts with these assertions. As an initial matter, Martinko has presented evidence showing that no-pork meals are "not always prepared ahead of time" or kept separate from regular meals. Avery Decl. ¶ 7. He has also presented evidence showing that individual food service personnel engage in a practice of slicing and/or portioning out both pork and pork-free meats without cleaning the work area or food-handling equipment, and without changing gloves. Partlow Decl. ¶¶ 9. Furthermore, according to one of Martinko's witnesses, food service personnel "regularly" handle unpackaged food items with gloved hands and without utensils, including food items containing pork, and then handle other food items, special diet trays, and cups without changing gloves. Avery Aff. ¶¶ 3-5,

16

9.  A jury could reasonably infer from this evidence that kitchen workers and staff at the NHSP regularly engage in practices that cause cross-contamination of religious no-pork meals with pork.

The record also contains witness testimony describing specific incidents in which no-pork meals, including Martinko's meals, were contaminated with pork products.  Such testimony includes Martinko's accounts of "someone handling pork and then touching a food intended for [his] special diet[;]" "pork foods being ladled over the top of special diet food where the pork drips into the dish below[;]" and "a special diet food item [that was] placed on a tray with pork and then returned to the pan, contaminating all the other food in that pan."  Martinko Aff. ¶ 15.  It also includes Partlow's description of ham in the vegetarian soup used for special diet meals on January 7, 2022, and Bader's observation of a meal server engaging in cross-contamination of no-pork soups while serving both pork and no-pork soups on March 4, 2023.  Partlow Aff. ¶ 3; Bader Decl. ¶ 8.  Additionally, in his Affidavit, Partlow testified that he witnessed "many instances" between April 2021 and April 2022 "where cross-contamination between pork and the non-pork alternative occurred at the preparation stage[,]" as well as "cross-contamination of the no-pork diet with pork at the point where trays are made."  Partlow Aff. ¶¶ 9-10.  When viewed in Martinko's favor, the record is sufficient to support a reasonable inference that ordinary food handling practices at the NHSP commonly lead to pork contamination of no-pork religious diet foods and cause prisoners on the no-pork diet to regularly ingest pork.  It is also sufficient to support a reasonable inference that during the many years Martinko was receiving a no-pork religious diet, his special diet food was often, if not routinely, contaminated with pork products.

The defendants argue that "isolated incidents of negligence regarding the handling of food and cross-contaminants 'do not impose a substantial burden upon the exercise of religious faith.'" Doc. No. 55-1 at 9-10, (quoting Miles v. Lumpkin, No. 6:20cv334, 2022 WL 4245540, at *5, U.S.

17

Dist. LEXIS 152364, at *14 (E.D. Tex. July 1, 2022)).  Relevant authority supports the defendants'

assertion that something more is needed to establish a substantial burden for purposes of RLUIPA

and the First Amendment's Free Exercise Clause.  See Miles, 2022 WL 4245540, at *5, U.S. Dist.

LEXIS 152364, at *14 ("The courts have consistently held that allegations of isolated incidents or

negligence" are insufficient to support a RLUIPA claim), and cases cited; Wiggins v. Griffin, 86

F.4th 987, 997 (2d Cir. 2023) (ruling that "isolated acts of negligence cannot violate an individual's

free exercise of religion"); Mbonyunkiza v. Beasley, 956 F.3d 1048, 1054 (8th Cir. 2020) (holding

that prisoner could not overcome summary judgment for defendants on claim alleging violations

of his right to free exercise of religion where evidence showed that kitchen staff inadvertently

served plaintiff food containing pork on only four occasions); Colvin v. Caruso, 605 F.3d 282, 293-

94 (6th Cir. 2010) (ruling that defendants were entitled to summary judgment on plaintiff's First

Amendment free exercise claims where plaintiff  "asserted only isolated incidents" in which

defendants served him non-kosher food); Gallagher v. Shelton, 587 F.3d 1063, 1070 (10th Cir.

2009) ("an isolated negligent act of the Defendants cannot support a claim that the Plaintiff was

denied his First Amendment right to freedom of religion"); Lovelace v. Lee, 472 F.3d 174, 201

(4th Cir. 2006) (holding that "negligent acts by officials causing unintended denials of religious

rights do not violate the Free Exercise Clause").  On the other hand, "evidence of pervasive

'mistakes' might support a claim that [the prison] had a *de facto* policy of ignoring or deviating

from its free-exercise-compliant policies[.]"  Mbonyunkiza, 956 F.3d at 1055.  This court finds

that Martinko has presented sufficient facts to demonstrate the existence of such a policy with

respect to his no-pork religious meals.[9]

---

[9] The defendants argue that "[t]he Plaintiff appears to rely on [only] two alleged instances of pork contamination: three Passover meals in 2021, and dinner during the Superbowl in 2022."  Doc. No. 55-1 at 9.  This argument, which is based on allegations in Martinko's complaint,

The plaintiff argues, and the record indicates, that Martinko has been complaining about the presence of pork in his religious no-pork meals for a number of years.  See Doc. No. 60 at 8, 10 (arguing that the defendants have failed to correct the issue of pork contamination in Martinko's religious meals for more than five years and claiming that he has submitted over 100 complaints to the DOC addressing the issue.); Martinko Aff. ¶¶ 4-7 (asserting that the kitchen has "engage[d] in a pattern of violating [Martinko's] religious diet "over the past five years[,]" and "still serves [him] food items that violate [his] diet" even though he asks for no pork at every meal.).  As described above, Martinko's complaints about the repeated presence of pork in his no-pork meals are consistent with witness accounts of cross-contamination of no-pork meals with pork and routine violations of proper food handling practices at the NHSP.  Because the record supports a reasonable inference that Martinko's no-pork meals were repeatedly contaminated with pork over the course of more than five years, the defendants have not shown that they are entitled to summary judgment on the grounds that the no-pork diet satisfies the restrictions of the plaintiff's religious diet.  See Brandon, 938 F.3d at 34 (ruling that defendants were not entitled to summary judgment where evidence gave rise to a reasonable inference that the plaintiff was served "many more than 10 meals containing pork.").

<u>Cross-Contamination of Kosher Meals</u>

The defendants next assert that there is no substantial burden on Martinko's religious exercise because Martinko has the option to receive, and has been receiving, a pork-free kosher diet and because the DOC "takes numerous steps to prevent pork contamination" of kosher meals

---

mischaracterizes the evidentiary record before the court.  As detailed herein, the available evidence, when viewed in the light most favorable to Martinko, supports a reasonable inference that there have been ongoing, widespread incidents involving contamination of no-pork meals with pork at the NHSP.

at the NHSP.  Doc. No. 55-1 at 10.  In support of this argument, the defendants point to evidence showing that the "DOC purchases Kosher entrées in sealed, shelf-stable packages" that are heated in the original packaging and provided to prisoners while they remain sealed.  Id.  They also highlight evidence showing that the "DOC stores and prepares other Kosher food items, such as fresh vegetables and pre-made bread, using Kosher [compliant] surfaces and utensils[,]" and keeps the kosher food and utensils "separate from non-Kosher food items, utensils, and surfaces."  Id. Based on that evidence, the defendants maintain that "there can be no cross-contamination" of the kosher meals with pork.  Id. at 12.  Because Martinko has not presented adequate facts to support a reasonable inference that any of his own kosher meals have been contaminated with pork, it is undisputed that the defendants, by providing him with the opportunity to obtain kosher meals, have imposed no substantial burden on his ability to practice his religion.  Therefore, this court recommends that the defendants' motion for summary judgment be granted on this basis.

The summary judgment record contains no direct evidence of pork contamination in Martinko's kosher meals.  Nor is there any evidence that could support a reasonable inference that such contamination occurs.  Although Partlow describes improper food handling of religious, no-pork diet meals at the NHSP, including "many instances" when he witnessed cross-contamination of those meals with pork, he provides no facts regarding the handling of kosher meals at the prison. See Partlow Aff. ¶¶ 2-10.  Similarly, Bader describes a specific incident involving the contamination of no-pork soup with pork.  Bader Decl. ¶ 8.  However, he provides no references to the kosher meals or the handling of the kosher meal trays.  See id. ¶¶ 1-8; Bader Aff. ¶¶ 4-9. Furthermore, while Avery states in his sworn statement that the "[r]esident line workers and kitchen supervisor staff regularly handle unpackaged food items[,]" including but not limited to pork-based foods, "with gloved hands (and without utensils)," "and then handle special diet trays

(including Kosher trays) and cups without changing gloves[,]" he provides no evidence linking those practices to Martinko's own kosher meal trays. See Avery Decl. ¶¶ 3-9. Nor has Avery or any other witness provided evidence indicating that pork ever comes into contact with the food on the kosher food trays. Accordingly, Martinko has not shown that the defendants' conduct causes him to violate his religious practice of eating a pork-free diet.

In his opposition to the motion for summary judgment, Martinko argues that kitchen staff contaminate his kosher meals with pork by handling pork and then touching his packaged kosher entrees, trays and cups. Doc. No. 60 ¶¶ 14-15. He further argues that this practice forces him to touch contaminated surfaces and ingest any pork that touches his hands. Id. ¶ 15. These arguments are insufficient to raise a genuine issue of fact regarding cross-contamination of Martinko's kosher meals. To defeat summary judgment, the nonmoving party must provide "submissions of evidentiary quality" showing "that a trialworthy issue persists." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)). Here, however, Martinko provides no specific evidence to support his assertions regarding cross-contamination of his kosher meals. See id. ¶ 14 (citing evidence confirming that no part of Martinko's kosher meal should have contact with pork but containing no facts showing that such contamination occurs), ¶ 15 (citing Doc. No. 48 ¶ 7, which consists of the plaintiff's unsupported argument).

Furthermore, even if the record were adequate to support a reasonable inference that Martinko's kosher trays, cups and packaged entrees may have become contaminated with pork products, and that the contamination may have caused Martinko to ingest pork, such general allegations of improper food handling practices would not be enough to establish a substantial burden on Martinko's religious practice. As described above, "isolated incidents" of pork

contamination and "negligence" that results in cross-contamination of kosher food with pork are insufficient under both RLUIPA and the free exercise clause of the First Amendment to impose a substantial burden on the exercise of religious faith.   In the instant case, Martinko has failed to present any facts regarding the frequency with which kitchen workers may have touched pork and then touched his kosher tray, cup or packaged entree.   He has also failed to present any facts showing that such incidents were deliberate rather than negligent.   Therefore, the record fails to support his claims against any of the defendants and the defendants are entitled to judgment as a matter of law.[10]   See, e.g., Colvin, 605 F.3d at 294 (finding that defendants were entitled to summary judgment on plaintiff's First Amendment claims "[g]iven the isolated nature of the nonkosher food service and the lack of any evidence indicating deliberate violations of [the prison's] kosher-meal program"); Abdulhaseeb v. Calbone, 600 F.3d 1301, 1321 (10th Cir. 2010) (finding that plaintiff failed to show a substantial burden on his religious exercise where plaintiff identified "one occasion when he was forced to accept objectionable products" on his no-pork food tray but "failed to provide any other specific evidence" beyond general allegations of improper food handling practices, to support his claims under RLUIPA); Miles, 2022 WL 4245540, at *5, U.S. Dist. LEXIS 152364, at *14 (ruling that defendants were entitled to summary judgment on plaintiff's RLUIPA claim where plaintiff complained that careless handling of his pork-free meals could result in a "high likelihood of contamination" and "may have done so on multiple although

---

[10] As this court described in the Background section above, nothing in the record suggests that Martinko was prevented from seeking a kosher diet at any time since he converted to Messianic Judaism.   Therefore, he cannot support a claim that the defendants imposed a substantial burden on his religious exercise at any relevant time.

unspecified occasions" but failed to allege anything more than "isolated incidents or negligence").[11]

## B.  **Defendants' Challenge to Martinko's Claim for Damages**

The defendants argue that even if the court declines to grant them summary judgment on Martinko's RLUIPA and free exercise claims, they are entitled to judgment as a matter of law with respect to his claim for emotional distress damages because any such damages are barred by section 1997e(e) of the PLRA.[12]  Doc. No. 55-1 at 15.  Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  The defendants contend that because there is no evidence that Martinko suffered any physical injury due to their alleged violations of his First Amendment right to the free exercise of religion, § 1997e(e) precludes the plaintiff from recovering money damages for emotional distress.  Doc. No. 55-1 at 15.  This court agrees.

The First Circuit has not addressed the question whether § 1997e(e) bars emotional distress damages in cases like this one, where the plaintiff asserts claims for violations of his constitutional rights but has not presented evidence of a physical injury.  See Kuperman v. Wrenn, 645 F.3d 69, 73 n.5 (1st Cir. 2011) (noting that § 1997e(e) "could preclude [plaintiff] from recovering on his § 1983 claim seeking compensatory damages" but declining to reach the issue (emphasis added));

---

[11] In light of this court's determination that there is no substantial burden on Martinko's ability to practice his religion due to the availability of kosher meals at the NHSP, it is unnecessary to address the defendants' argument that they are entitled to summary judgment because Martinko has the option of purchasing meals from the canteen that comply with his religious diet.  See Doc. No. 55-1 at 12-13.

[12] The court previously dismissed Martinko's claims for damages under RLUIPA.  Doc. No. 44 at 1.  Therefore, his claims for damages are based only on the alleged violations of his First Amendment right to the free exercise of religion.

23

Beaulieu v. N.H. Governor, No. 16-cv-471-JD, 2018 WL 3193234, at *13, 2018 U.S. Dist. LEXIS 107964, at *35 (D.N.H. June 28, 2018) ("The First Circuit has not decided whether recovery on claims for violations of constitutional rights, without physical injury or a sexual act, are barred by § 1997e(e)").  "However, most circuits have held that § 1997e(e) does apply to [civil rights] actions alleging constitutional violations, so that [a plaintiff] cannot recover damages for mental or emotional injuries resulting from constitutional violations absent a showing of physical injury." Mattei v. Dunbar, 217 F. Supp. 3d 367, 380 (D. Mass. 2016) (citing cases from the Second, Third, Fifth, Seventh, Eighth, Tenth and District of Columbia Circuits in which courts have held that the PLRA precludes damages for mental or emotional injuries caused by constitutional violations). Accordingly, the weight of authority supports the defendants' motion for summary judgment with respect to damages.

While Martinko argues that he is entitled to seek money damages for the harm caused by the alleged deprivation of his constitutional rights, he does not appear to contest the defendants' argument that § 1997e(e) bars recovery of damages for emotional distress.  See Doc. No. 60 at 16 (citing case law supporting recovery of nominal and punitive damages, but not emotional distress damages, for violations of constitutional rights).  The defendants are not challenging Martinko's right to pursue damages other than those for emotional distress.  Given the language of § 1997e(e) and the weight of authority in the Circuits that have addressed the issue, this court concludes that the statute "precludes compensatory damages for mental and emotional injuries absent a showing of physical injury," and that Martinko cannot recover damages for any emotional distress that he may have suffered as a result of the alleged First Amendment violations.  See Mattei, 217 F. Supp. at 380 (relying on decisions from "most circuits" and statutory language of § 1997e(e) to conclude that plaintiff "cannot recover compensatory damages for mental or emotional injuries suffered as

a result of his alleged First Amendment violation.").  In the event the court declines to grant the motion for summary judgment on Martinko's RLUIPA and free exercise claims, this court recommends that it grant the motion with respect to Martinko's claims for emotional distress damages.

## IV. CONCLUSION

For all the reasons set forth herein, this court recommends that the "Defendants' Motion for Summary Judgment" (Doc. No. 55) be GRANTED.  Any objections to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  The fourteen-day period may be extended upon motion.  Failure to file any objection within the specified time waives the right to appeal the district court's Order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).  Only those issues raised in the objection(s) to this Report and Recommendation "are subject to review in the district court" and any issues "not preserved by such objection are precluded on appeal."  Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (quoting Keating v. Sec'y of Health & Hum. Servs., 848 F.2d 271, 275 (1st Cir. 1988)).

Andrea K. Johnstone
United States Magistrate Judge

August 30, 2024

cc:    David M. Martinko, pro se
       Brandon Francis Chase, Esq.
       Brendan Avery O'Donnell, Esq.