**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

David M. Martinko

        v.                                                 Case No. 22-cv-238-LM-AJ

N.H. Department of Corrections Commissioner et al.[1]

### **REPORT AND RECOMMENDATION**

Before the court in this civil rights action is New Hampshire State Prison for Men ("NHSP") prisoner David Martinko's (third) motion for a preliminary injunction (Doc. No. 94) ("Third PI Motion"), relating to his no-pork religious diet (which excludes pork, shellfish, and foods derived from those ingredients).[2]  The Third PI Motion seeks two types of preliminary injunctive relief:  (1) an injunction requiring defendants to label all of his packaged lunches with his name and "no pork" when his lunches are delivered to his prison jobsite in the NHSP North Yard; and (2) an order prohibiting defendants from serving him any meals that contain pork,

---

[1] Defendants who have been served in this matter (in their individual and official capacities) are: (former) New Hampshire Department of Corrections ("DOC") Commissioner Helen Hanks; New Hampshire State Prison ("NHSP") Warden Michelle Edmark; DOC Administrator of Logistics Jonathan Hanson, DOC Assistant Administrator of Logistics Jeff Smith, NHSP Kitchen Supervisor Robert Heath, (former) NHSP Kitchen Supervisor Todd Sheehan, NHSP Kitchen Supervisor Heather Cornock, NHSP Chef Hans Peter Bossert, NHSP Chef Jacob Post, NHSP Chef Jonathan Matteau, NHSP Chef Marcus Taylor, NHSP Administrator C.J. Boulet, (former) NHSP Chef Elizabeth Mosqueda-Smith, and DOC Dietician Todd Popovich.

[2] Martinko has moved twice previously for preliminary injunctions; both times those motions were denied without prejudice.  See Martinko v. N.H. Dep't of Corr., No. 22-cv-238-LM, 2023 U.S. Dist. LEXIS 55125, at *12 (D.N.H. Mar. 10, 2023) (Doc. No. 34), R&R adopted, 2023 U.S. Dist. LEXIS 53459 (D.N.H. Mar. 29, 2023) (Doc. No. 36); see also Martinko v. N.H. Dep't of Corr., No. 22-cv-238-LM-AJ, 2024 U.S. Dist. LEXIS 51435, at *14, 2024 WL 3541247, at *5 (D.N.H. Mar. 1, 2024) (Doc. No. 66), R&R adopted, 2024 U.S. Dist. LEXIS 49998, 2024 WL 3541140 (D.N.H. Mar. 21, 2024) (Doc. No. 69).

shellfish, and their derivatives, as well as any of the following foods (whether or not they contain

pork or shellfish):

> bologna, salami, hot dogs, corn dogs, and any other processed lunchmeat; sausage links and patties; meatballs and meat crumbles; spaghetti with meat sauce; spring rolls; baked beans; toaster pastries, jello, and any other product that contains gelatin; anything cooked in lard or bacon grease.

Doc. No. 94 at 6-7.  The court held an evidentiary hearing on Martinko's Third PI Motion in

June 2025.

### Background

The following facts are gleaned from the record at the evidentiary hearing in this matter

and filings related to Martinko's instant motion, and are essentially undisputed for purposes of

Martinko's Third PI Motion.  Breakfasts, lunches, and dinners are served to the general prison

population in the NHSP dining hall in multiple shifts every day.  In addition, some prisoners, like

Martinko, may receive packaged meals delivered to their prison jobsites.

The NHSP Kitchen follows a pre-set menu of meals that generally repeats every four

weeks.  On days when a pork product is planned for service to the general prison population, the

menu states that a "no pork alternative" will also be served.  Sometimes the no pork alternative is

the same meal served to those receiving vegetarian diets.

Prisoners who work in the NHSP kitchen are generally responsible for preparing meals

served in the dining hall.  Prisoners working as line servers in the kitchen are responsible for

transferring food from food service trays to individual meal trays in an assembly-line fashion.

Defendants in this lawsuit include non-prisoner chefs whose job responsibilities include

supervising prisoners in the NHSP kitchen.

The DOC has a published policy of accommodating religious diets.  See Pl.'s Ex. 12; Def.'s Ex. G.[3]  Four types of religious diets are available: vegetarian without egg, vegetarian with egg, no pork, and kosher/halal.  Pl.'s Ex. 12.  Martinko, who practices Messianic Judaism, was on the "no-pork" diet before he filed this lawsuit until March 28, 2023, when he switched to the kosher/halal diet.  He switched back again to the no pork diet on November 12, 2024.  It is undisputed that his Third PI Motion relates only to the no pork diet he is presently receiving.

For purposes of the Third PI Motion, defendants do not dispute the sincerity of Martinko's religious beliefs, the religious motivation of his dietary restrictions, or the description of what his religious diet prohibits.  Defendants stipulated that Martinko's no-pork diet excludes pork, shellfish, and their derivatives.  Martinko also explained by way of a proffer that his religious diet prohibits him from eating meals that have been cross-contaminated with prohibited foods.  He explained that such contamination, in its simplest form, occurs if a server handles prohibited food with a gloved hand and then touches Martinko's food, his tray, or his utensils, using the same gloved hand.

Martinko's claims pertinent to his Third PI Motion are proceeding against the defendant NHSP chefs and their supervisors, in their official capacities, under the Religious Land Use and Institutionalized Persons Act ("RLUIPA").[4]  Martinko seeks injunctive relief.  He argues that he has reason to doubt whether defendants routinely serve him meals that comply with his religious

---

[3] The exhibits are identified here as they appear in the record of the June 2025 evidentiary hearing.

[4] Because RLUIPA is more protective of a prisoner's religious practices than the First Amendment, see Bader v. Wrenn, 675 F.3d 95, 98 (1st Cir. 2012), the court focuses on Martinko's RLUIPA claims, without expressing any opinion regarding the merits of his First Amendment Free Exercise Clause claims.

diet, particularly when he cannot tell by looking at the food if it contains prohibited ingredients, and the chefs or line servers are unable or unavailable to answer his questions about the ingredients. He asks this court to order the labeling of all of his lunches delivered to his jobsite and to enjoin defendants from putting any of the specific foods he lists on his meal trays that he considers to be difficult to identify as pork-free or shellfish-free.

In their objection to the Third PI Motion, defendants acknowledge that there were incidents in January 2025 when Martinko received noncompliant entrees (soup made with pork and spring rolls made with oyster sauce). Characterizing those incidents as isolated mistakes which have not recurred, defendants contend that their official policies, and actual practices, routinely and effectively safeguard Martinko's religious diet in a manner that does not impose any "substantial burden" upon his religious exercise.

Considering the type of relief Martinko requested, the court generally limited the scope of the June 2025 hearing to evidence regarding the presence of prohibited "ingredients" in his meals after November 2024, when Martinko began receiving the no pork diet again. The court limited the evidence to ensure that the hearing would center on whether injunctive relief is presently necessary.

As explained more fully below, this court concludes that Martinko did not make the requisite strong showing of a likelihood of success on the merits of the RLUIPA claims underlying his Third PI Motion, and also failed to demonstrate that either court-ordered labeling of his North Yard meals or an injunction eliminating processed meats and other specific foods from his meals is presently necessary to avoid irreparable harm. Accordingly, the district judge should deny Martinko's Third PI Motion, without prejudice.

**<u>Preliminary Injunction Standard</u>**

"[P]reliminary injunctive relief is 'an extraordinary and drastic remedy that is never awarded as of right.'" Harry v. Countrywide Home Loans, Inc., 215 F. Supp. 3d 183, 186 (D. Mass. 2016) (citations omitted).  A party seeking preliminary injunctive relief must establish that "'he is likely to succeed on the .merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" Glossip v. Gross, 576 U.S. 863, 876 (2015) (citation omitted).

The likelihood of success and irreparable harm are factors that weigh most heavily in the analysis.  See Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011).  "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success — rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (citations omitted).

A showing that the applicant will likely suffer irreparable harm before the case is resolved is perhaps the "single most important prerequisite for the issuance of a preliminary injunction." Voice of the Arab World, 645 F.3d at 32 (internal quotation marks omitted) (citing 11A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2948, at 129 (2d ed. 1995)); see also Braintree Labs., Inc. v. Citigroup Glob. Mkts., Inc., 622 F.3d 36, 41 (1st Cir. 2010) (mandatory preliminary injunction that alters rather than preserves status quo normally should be granted only when exigencies of situation demand such relief).  "Irreparable harm most often exists where a party has no adequate remedy at law." Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated

fears of what the future may have in store." Id.  The loss of religious freedoms guaranteed by RLUIPA can be an irreparable harm.  Franciscan All., Inc. v. Becerra, 47 F.4th 368, 380 (5th Cir. 2022); Harris v. Wall, 217 F. Supp. 3d 541, 560 (D.R.I. 2016); see also Ramirez v. Collier, 595 U.S. 411, 433 (2022) (capital defendant who could not engage in religious practice in execution chamber demonstrated irreparable harm).

The burden of proof as to each of the preliminary injunction factors is on the movant.  Esso Std. Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).  The Prison Litigation Reform Act ("PLRA") further requires that injunctive relief be both narrowly drawn and the least intrusive means necessary to correct the harm asserted.  See 18 U.S.C. § 3626(a)(2).

## Discussion

### I. Likelihood of Success as to RLUIPA Claims

#### A. Elements

RLUIPA provides, in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).[5]

> RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." [42 U.S.C.] § 2000cc-5(7)(A). And a substantial burden is when the state "denies an important benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs."

---

[5] Defendants do not dispute that Martinko's religious diet is a religious exercise motivated by sincere religious beliefs.

Harris v. Muhammad, 165 F.4th 1345, 1351 (9th Cir. 2026) (citations omitted)

### B.    Substantial Burden

#### 1.    Standard and Martinko's Arguments

Martinko has the burden of showing that his religious diet is substantially burdened by defendants' policies and practices.  A policy "substantially burdens religious exercise under RLUIPA if it coerces the inmate to modify his religious behavior significantly or to violate his religious beliefs."  Farrow v. Stanley, No. 02-567-PB, 2005 DNH 146, 2005 U.S. Dist. LEXIS 24374 at *14, 2005 WL 2671541, at *4 (D.N.H. Oct. 20, 2005).

Construed liberally, Martinko's Third PI Motion and his post-hearing briefs highlight five practices that he claims substantially burden his no-pork religious diet:

- The number or frequency of errors in serving him food containing pork or shellfish ingredients;

- The practice of allowing chefs discretion to set up their food service lines when there are foods on the line that violate his religious diet;

- Defendants' practice of equivocating (or expressing a lack of knowledge) as to the pork-content of foods served to him;

- The policy of labeling his lunches delivered to the North Yard only if they differ from the meals served to other prisoners receiving regular lunches; and

- The practice of serving him no-pork/no-shellfish versions of processed meats and other foods listed in his motion (such as chicken hotdogs or turkey ham), which resemble foods made of prohibited ingredients.

The court addresses the evidence and pertinent law relating to these issues below.

#### 2.    Number or Frequency of Errors

A prisoner seeking to establish governmental liability under RLUIPA must prove that that the governmentally-imposed burden at issue is "substantial."  Holt v. Hobbs, 574 U.S. 352, 361 (2015); Lebaron v. Spencer, 527 F. App'x 25, 28 (1st Cir. 2013).  Where prison practices

routinely result in violations of the plaintiff's religious diet, a reasonable fact-finder may find the existence of a substantial burden.  Martinko v. N.H. Dep't of Corr., No. 22-cv-238-LM-AJ, 2024 DNH 081, 2024 U.S. Dist. LEXIS 171989, at *2, 2024 WL 4275726, at *1 (D.N.H. Sept. 24, 2024) (Doc. No. 80) (denying defendants' motion for summary judgment based on availability of no-pork diet, in light of affidavits and other evidence, construed in light most favorable to Martinko, showing that his no-pork meals were "'often, if not routinely, contaminated with pork products' as a result of routine prison practices (i.e., a 'de facto policy' to ignore contamination)").  But evidence of multiple violations is not critical in every case.  See LeBaron, 527 F. App'x at 30 (citing Ramsey v. Goord, 661 F.Supp.2d 370, 396–97 (W.D.N.Y. 2009)).  Pertinent considerations include whether the violations at issue were "isolated" instances that could be deemed de minimis and not "substantial" in relation to plaintiff's religious practice.  Cf. Mbonyunkiza v. Beasley, 956 F.3d 1048, 1054 (8th Cir. 2020) ("an isolated, intermittent, or otherwise de minimis denial or interruption of an inmate's religiously required diet" does not amount to "substantial burden" under First Amendment Free Exercise Clause (citing cases)).

The evidence shows that in the almost seven-month period preceding the hearing while Martinko was on the no pork diet, he received three meals with ingredients prohibited by his religious diet.  In particular: (1) he ate soup made with pork and beans on December 31, 2024, which was mislabeled as turkey and bean soup; (2) he ate pork meatballs served with spaghetti once in January 2025; and (3) he ate spring rolls made with oyster sauce as part of his lunch at his jobsite on February 13, 2025.[6]  There is no evidence that any of those violations was intentional.

---

[6] Martinko's post-hearing filings (Doc. No. 122) refer to a May 7, 2025 discovery conference in which defendants' counsel expressed a willingness to stipulate that sometime prior

Martinko asserts here that he also received meals made of sliced ham, salami, and bologna which he believes were pork-derived, including one time when he compared what he would have received at his jobsite against what he was in fact served as the no pork alternative in the dining hall, leading him to conclude that the jobsite sandwich was the same bologna served on the main line. The responses to his Inmate Request Slips relating to those circumstances do not support a finding that the sandwiches were made of pork products. Luncheon meats served at the NHSP can be made of chicken or turkey and look like their pork equivalents. Martinko has not demonstrated the existence of any other violations of his diet relating to the placement of prohibited foods on his meal tray in the relevant time period.

From November 12, 2024 to June 6, 2025, the time period when Martinko was on the no pork diet prior to the evidentiary hearing, Martinko received more than 600 meals.[7] The small number of errors in almost seven months and the ratio of errors to total meals served in that time period support a finding that the impact on Martinko's religious diet is de minimis. See, e.g.,

---

to June 26, 2021, when their pork content was discovered and the sausages were no longer served to prisoners on the no pork diet, Martinko received Jenny-O turkey sausages containing pork. See Doc. No. 105, at 6. The exact nature of that proposed stipulation and its application to plaintiff's claims for preliminary injunctive relief are facts not before this court at this time. There is no further evidence in the Third PI Motion record regarding those sausages.

[7] Expanding the time period to include part of the time when Martinko received the kosher/halal diet and the 1300+ meals served to him from March 9, 2024 to June 6, 2025, Martinko offered evidence of only one other occasion in 2024 where a food item potentially made of pork gelatin was served to him. Defendant Robert Heath handed Martinko a Rice Krispie treat along with his kosher/halal meal tray on March 9, 2024. Heath told Martinko that Heath was not sure if Martinko could eat the treat because Heath had not had time to look it up on the internet. Martinko simply accepted the meal tray and the Rice Krispie treat and then gave the treat to another prisoner. Martinko identified that March 9, 2024 incident as the only time a chef who admitted to not knowing the pork content of food on Martinko's tray did not substitute a different nonpork item (like a piece of fruit or vegetables) if Martinko voiced concern about the ingredients of any item on his meal tray.

Rapier v. Harris, 172 F.3d 999, 1006, at n.4 (7th Cir. 1999) ("unavailability of a non-pork tray . . . at 3 meals out of 810 does not constitute more than a de minimis burden"); Cooper v. Nimirowski, No. 14–cv–011–SM, 2014 DNH 053, 2014 U.S. Dist. LEXIS 33875, at *3, 2014 WL 1003842, at *1 (D.N.H. Mar. 13, 2014) ("allegation that, on two occasions, [prisoner] was served a meal that contained pork is insufficient to assert a plausible claim that his religious practice has been 'substantially burdened' under . . . RLUIPA"). Cf. Brandon v. Kinter, 938 F.3d 21, 36 & n.11 (2d Cir. 2019) (evidence of ten violations over six months that were not isolated instances precluded summary judgment on whether burden was substantial).

Moreover, the violations involved different ingredients and occurred at different mealtimes on different days under the watch of different supervisory chefs – one of whom, Chef John K., Martinko specifically characterized as tending to be careful in how he handles things and sets up his food service line. The evidence concerning John K. supports a finding that his mistake was isolated. The evidence similarly fails to show any substantial connection between the spring roll error and the other two errors relating to meals made of leftovers served on the main line. To that extent, Martinko has failed to demonstrate a likelihood of success on the merits of the substantial burden aspect of a RLUIPA claim arising from the number and frequency of errors of an isolated nature in the relevant time period.

###        3.        Main Line Service

Martinko argues that his religious diet is substantially burdened by the practice of allowing chefs to configure the serving line in a way that allows prohibited foods to be placed on his meal tray. He testified that he witnessed a line server filling a regular diet meal tray adjacent to his religious diet meal tray by using one hand to put items on Martinko's tray and his other

hand to put items on the regular tray.  Martinko then saw that line worker stop, turn around,, change his glove, and start over with a new gloved hand and new food for Martinko, leading Martinko to believe the worker realized he had accidentally switched hands.  Where Martinko admits that the incident did not violate Martinko's diet, the evidence does not demonstrate the existence of any substantial burden.

Chef Kristin Zaleski testified at the hearing about how she sets up the service line during her weekday shift.  When asked about a claim Martinko made that a person handled pork with a gloved hand and then touched the no-pork alternative with the same, unwashed gloved hand, Chef Zaleski credibly testified that Martinko was mistaken.  She ensures the serving line has separate individuals handling the pork and pork alternative items, such that there would never be a circumstance where the pork handler would touch the no-pork alternative.  Chef Zaleski, who works the serving line every day she is at work, has seen no pattern of the kitchen failing to adhere to religious dictates surrounding Martinko's religious diet.  Her testimony supports a finding that the discretion granted to individual chefs in setting up their serving lines has not substantially burdened Martinko's religious diet, with respect to the risk that prohibited items will be placed on his meal trays, and the evidence at the hearing did not undermine that finding.[8]

---

[8] Martinko testified that there have been occasions when he has seen his meal tray passed down the line when there are prohibited food items being served to those on the regular diet.  In particular, he asserts he has seen the line set up in that fashion on Sunday dinners when scalloped potatoes and ham are served to those receiving a regular diet, and when seafood salad with crab juice is served to prisoners on the regular diet.  His evidence in that regard is not inconsistent with Chef Zaleski's as she testified that she sets up the line her own way and does not know how other chefs work.

### 4.    Inconsistent Answers, Unlabeled Lunches, and Look-alike Foods

Witnesses including Charles Lancey and Director Heather Cornock testified that the practice in the NHSP kitchen among the staff who prepare the meals is to treat leftovers with unknown ingredients as if they include pork.  Martinko argues that the effect of that policy substantially burdens his religious diet by leading him to believe that foods served to him as pork-free at dinner are in fact pork-derived in the opinion of prisoner cooks.

Witnesses familiar with the NHSP Kitchen practices of preparing packaged lunches for delivery to the North Yard testified credibly, and consistently with grievance responses in evidence, that the kitchen, as a general rule, labels Martinko's lunches served at his jobsite only if his lunch differs from the lunches served to prisoners receiving the regular diet, such that if the regular diet does not include pork, neither Martinko's name nor "no pork" will appear on his lunch package.  Martinko argues that the failure to put his name and "no pork" on all of his lunches increases his uncertainty regarding whether the lunch he receives is his religious diet.

Martinko raises a similar argument about the impact of serving him any processed meats, and other types of food listed in his motion, on his meal trays as those foods resemble foods prohibited by his diet.  Because he cannot trust that those foods are compliant with his diet when served to him, he avoids eating them and buys substitutes from the canteen.

Martinko has filed more than 300 Inmate Request Slips and grievances relating to his religious diet.  There were three documented violations of his diet relating to the ingredients served to him.  There is no evidence or claim in this case that Martinko's persistent investigation relating to his religious diet is itself a religious exercise or a required component of his religious diet.  The burden plaintiff describes, uncertainty and his response thereto, is not a burden imposed by the government on his religious exercise of avoiding pork and shellfish.  RLUIPA

protects Martinko's religious diet from substantial governmental burdens, but does not shield him from discomfort resulting from uncertainty.

Martinko has failed to show that he is likely to succeed on RLUIPA's substantial burden element which is a prerequisite to the RLUIPA claims underlying his Third PI Motion. Accordingly, the district judge should deny his motion.

## II.    **Irreparable Harm**

An additional reason to deny Martinko's motion is his failure to demonstrate that the relief he seeks is necessary to prevent irreparable harm while his lawsuit is pending. The order he seeks, directing defendants to serve him no pork, shellfish, or their derivatives while this action is pending, is redundant of the defendants' ongoing practices.

The labeling requirement Martinko asks the court to impose is similarly unnecessary. Meals compliant with Martinko's religious diet are routinely and regularly delivered to him in the North Yard with or without labels. Requiring labels even if the meals are the same as those served to other prisoners at the same site receiving the regular diet is an administrative exercise serving no practical purpose.

And stripping some foods from Martinko's diet because they resemble pork-derivatives or shellfish-derivatives also fails to address any irreparable harm. If the harm he seeks to avoid is his payment of canteen costs to buy his own substitute foods, such a harm is compensable and thus not irreparable. Accordingly, Martinko has not demonstrated that the relief he seeks is necessary to avoid irreparable harm while this case is pending.

**Conclusion**

For the foregoing reasons, the district judge should deny plaintiff's Third PI Motion (Doc. No. 94), and the parties' proposed findings of fact and conclusions of law (Doc. Nos. 121, 122) should be granted to the extent consistent with this Report and Recommendation, and otherwise denied.  Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  The fourteen-day period may be extended upon motion.  Only those issues raised in the written objections "'are subject to review in the district court,'" and any issues "'not preserved by such objection are precluded on appeal.'"  Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016) (citations omitted).

_____
Andrea K. Johnstone
United States Magistrate Judge

March 6, 2026

cc:    David M. Martinko, pro se
       Peter Morris MacKenna, Esq.

14